UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:    2/8/2018              │
└─────────────────────────────────────┘
```

WAYNE T. RHONE,

                                    Plaintiff,

            -against-

NANCY A. BERRYHILL
Acting Commissioner of social Security,

                                    Defendant.

**1:16-cv-07213 (CM) (SDA)**

<u>REPORT AND RECOMMENDATION</u>

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED: 3|8|18                   │
└─────────────────────────────────────┘
```

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE COLLEEN MCMAHON, UNITED STATES DISTRICT JUDGE:**

Plaintiff, Wayne T. Rhone ("Rhone" or "Plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. (Compl., dated Sept. 15, 2016, ECF No. 2.) Presently before the Court is Rhone's motion, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings (Pl.'s Notice of Mot., ECF No. 14), and the Commissioner's cross-motion for judgment on the pleadings. (Def.'s Notice of Mot., ECF No. 17.)

For the reasons set forth below, the Court recommends that Plaintiff's motion be DENIED and the Commissioner's cross-motion be GRANTED.

**MEMO ENDORSED**

<u>PROCEDURAL HISTORY</u>

Rhone filed for disability insurance benefits on September 30, 2010, alleging a disability onset date of February 21, 2009. (Administrative R. ("R."), ECF No. 10, at 546.) The Social Security Administration ("SSA") denied Rhone's application on February 9, 2011, and Rhone subsequently requested a hearing with an Administrative Law Judge ("ALJ"). (R. 22, 45-54.) On January 17,

3/6/2018
No timely objections have been received to the Report. The Court
Thus adopts the Report as its opinion and directs that the Clerk
enter judgment for the Commissioner dismissing the
complaint.     Colleen McMahon, Chief Judge

2012, Rhone appeared and testified before ALJ Wallace Tannenbaum. (*Id.* at 31-44.) In a decision issued on January 23, 2012, ALJ Tannenbaum found that Rhone was not entitled to disability insurance benefits, and the Appeals Council denied Rhone's request for review. (*Id.* at 22-27, 31-54.) Rhone then filed an action in this Court challenging the final decision of the Commissioner. *See Rhone v. Colvin*, No. 13-CV-5766 (CM) (RLE), 2015 WL 920942, at *1 (S.D.N.Y. Jan. 16, 2015). District Court Judge Colleen McMahon remanded the case to further develop the record. *Id.* at *12. On August 11, 2015, Rhone, appearing *pro se*, attended a hearing before ALJ Michael Friedman. (R. 546.) ALJ Friedman denied Rhone's benefits application on September 23, 2015. (R. 556.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied review on August 10, 2016. (R. 536-39.) This action followed.

## FACTUAL BACKGROUND

### I.   Non-Medical Evidence And Testimony

Born on August 25, 1961, Rhone was 47 years old at the alleged onset of his disability and 53 years old at the time of the 2015 hearing. (R. 35, 562.) At the hearing, Rhone alleged disability due to rheumatoid arthritis in the left knee, tendonitis in the left ankle, pain in the left shoulder, difficulty walking and standing for lengths of time, difficulty concentrating and remembering instructions, and depression. (R. 565-579.)

Rhone is single and has no children. (R. 35) He lives alone in an apartment on West 43rd Street in Manhattan. (*Id.*). He is a high school graduate, and previously worked as an actor for over 20 years. (R. 36.) He has also worked briefly as a park enforcement officer and a ticket sales agent. (R. 36-37.) Rhone was last employed as a 3-1-1 telephone operator until he was laid off in

2

February 2009. (R. 565.) He had been seeing a psychiatrist once a week from 2008 until 2013, but has not seen one since and does not take psychotropic medication. (R. 568-69.)

Rhone testified that he has trouble sitting comfortably and cannot walk very fast, but is able to lift light groceries and cook modest meals. (R. 569-71.) He performs basic chores around his apartment, and occasionally reads and watches television. (R. 571.) Rhone testified at his hearing that he has a history of alcohol abuse but no longer "self-medicate[s]" using alcohol. (R. 572.) A vocational expert also testified at the hearing before ALJ Friedman. (R. 574-79.)

## II.   Medical Evidence Before The ALJ

### A.   Ryan Community Health Center

Rhone visited the Ryan Community Health Center ("Ryan Center") a total of eight times between August 10, 2009 and November 16, 2011. (R. 346-69.) During his first visit on August 10, 2009, Rhone was diagnosed with hypertension and depression. (R. 346-47.) He visited again on September 23, 2009, complaining of wrist and arm pain, and was given muscle relaxants and Tylenol and referred for a psychiatry follow-up for his depression. (R. 349, 351.) On April 16, 2010, Rhone sought a refill of his hypertension medication and also complained of shoulder and ankle pain. (R. 355). He was treated for ankle pain, benign hypertension and back pain, and prescribed Flexeril and Naproxen tablets. (Id.) On July 16, 2010, Rhone attended a follow-up visit regarding the pain in his left ankle. (R. 357.) He was diagnosed with Achilles tendonitis, and a continuing case of hypertension. (Id.) He was prescribed medication and referred for an orthopedic surgery consult. (Id.) On August 13, 2010, Rhone underwent an annual physical exam. (R. 359.) He reported that the pain in his ankle had improved and he had no depressive feelings at that time. (R. 359-60.) However, he was diagnosed again with hypertension and tendonitis, and additionally

3

with tobacco use disorder and hyperlipidemia.[1] (R. 361.) On January 11, 2011, Rhone visited complaining of jaw pain.[2] (R. 364.) The treating physician diagnosed him with gingivitis and prescribed medication and referred Rhone for diagnostic imaging. (*Id.*) Rhone's final two visits to the Ryan Center on April 29, 2011 and November 16, 2011, were both to fill prescriptions and provided no new diagnoses save for the continuing benign hypertension. (R. 366-68.)

## B. Jewish Board Of Family And Children's Services

Rhone received psychiatry treatment through the Jewish Board of Family and Children's Services ("JBFCS") from at least March 2008 to May 2012. (R. 219-303, 391-535.) Rhone was diagnosed with depression, anxiety and alcohol abuse. (R. 240.) On March 18, 2008, Rhone was evaluated by psychiatrist Dr. Michael Merkin. (R. 219.) Dr. Merkin recommended continuing treatment and psychiatric evaluation to help address his symptoms of anxiety and depression, and to decrease his consumption of alcohol. (R. 236.) Due to complications with health insurance, Rhone's next visit was not until July 31, 2009. (R. 391.) On that date, Rhone was seen by Licensed Clinical Social Worker ("LCSW") Andrea Levin ("Levin"). Levin reported that Rhone was suffering from depression, anxiety, and substance control issues based on a relapse after two years of sobriety. (R. 409.) Levin found that he was a low level risk for suicide based on passive thoughts of death (R. 399), and a moderate risk for substance abuse. (R. 400.) Levin recommended continued treatment, psychiatric evaluation and medication. (R. 409.) On October 5, 2009, Levin referred Rhone for psychiatric evaluation. (R. 413.) Levin noted that his alcohol and

---

[1] "Hyperlipidemia" is defined has "[e]levated levels of lipids in the blood plasma." *Stedman's Medical Dictionary* 922 (28th ed. 2005).

[2] In October 2010, Rhone also visited St. Luke's Hospital on two occasions complaining of toothache. (R. 210, 214.)

4

marijuana use had become a "serious factor" and concluded that his addiction behaviors required additional intervention. (R. 413) In September 2009, Levin and Merkin prepared a three-month treatment plan for Rhone that indicated his diagnoses remained the same, and that he continued to experience symptoms of depression which impaired his functioning. (R. 415, 417.) The plan called for Rhone to attend individual psychotherapy on a weekly basis. (R. 415.) When Rhone's treatment plan was reviewed in December 2009, Levin noted that his treatment has been delayed, but that at least one session had occurred. (R. 423.) The treatment plan review also notes that Rhone had reported to Merkin in November 2009 that he was attending Alcoholics Anonymous ("AA") meetings and was considering other types of treatment for his addiction. (R. 423.)

In March 2010, Rhone's treatment plan indicates that he had been sober since December 2009, was regularly attending AA meetings, and was coping well with associated social anxieties. (R. 432.) On June 11, 2010, Levin reported that though Rhone was sober, his attendance at AA meetings was less frequent and that his risk assessment remained "concern of risk." (R.441-42.) Levin also noted that Rhone's ankle tendinitis was provoking his anxiety. (R. 441.) On September 10, 2010, Rhone's treatment plan indicated that his status with irregular AA attendance remained unchanged, but that as a result of his tendinitis remitting, Rhone experienced less frustration. (R. 450.) He also began reaching out and engaging in more social situations, though this did trigger some anxiety for him. (*Id.*) In November 2010, Rhone's condition remained mostly the same, though a dental infection had again triggered his emotional response to pain. (R. 459.) Levin and Merkin indicated that Rhone had a Global Assessment of Function ("GAF") score at the time of 57, indicating moderate symptoms or moderate difficulties in social settings. (R. 460, 463.)

5

In March of 2011, Rhone reported to Levin that he had been struggling with financial and occupational concerns, and could not afford a necessary root canal. (R. 476.) The resulting pain and stress led Rhone to a relapse. (*Id.*) By May 2011, Rhone had stopped attending AA meetings due to social anxiety. (R. 485.) Rhone stayed sober, though his treatment plans between May 2011 and May 2012 show that he continued to suffer social anxiety. (R. 496, 503, 511, 520.) In May 2012, Rhone's diagnosis was changed to a dysthymic disorder[3] due to his chronic depressive symptoms. (R. 520, 523.)

On June 20, 2012, Levin filled out a Psychiatric/Psychological Impairment Questionnaire regarding Rhone. (R. 383-90.) She reported that Rhone was suffering from appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional liability, substance dependence, feelings of guilt/worthlessness, difficulty concentrating, social withdrawal or isolation, and generalized persistent anxiety. (R. 384.) Levin declined to comment on Rhone's potential performance in the workplace, as it was "outside her purview." (R. 386.) She recorded that his impairments were ongoing and should last for at least 12 months. (R. 389.)

### C. Dr. Thresiamma Mathew – Orthopedic Examination

Rhone was referred to Dr. Thresiamma Mathew by the Division of Disability Determination, and was seen on December 22, 2010. (R. 178.) Dr. Mathew noted Rhone's history of low back pain and ankle pain as well as his history of hypertension, stomach ulcer, anxiety, depression and posttraumatic stress disorder. (*Id.*) Rhone reported that his low back pain and left ankle pain were gradually getting worse. (*Id.*) After examination, Dr. Mathew indicated that

---

[3] "Dysthimic disorder" is defined as "a chronic disturbance of mood characterized by mild depression or loss of interest in usual activities." *Stedman's Medical Dictionary* 569 (28th ed. 2005).

6

Rhone had full dexterity in his hands and fingers, and a full range of motion in his upper extremities. (R. 179-80.) In addition, Rhone had a full range of motion in his range of motion in his cervical spine but was limited in his thoracic and lumbar spines with some tenderness in his right lumbrosacral paraspinal area. (R. 180.) Dr. Mathew also found full range of motion in Rhone's lower hips and knees, with some diminished plantar flexion in the left ankle. (*Id.*) Dr. Mathew ultimately noted that Rhone had "moderate limitation in lifting and ferrying heavy items, bending forward, prolonged walking, squatting, and climbing up and down stairs, and moderate limitation in prolonged sitting and standing." (R. 181.)

### D. Christopher Flach, Ph.D. – Adult Psychiatric Evaluation

On December 30, 2010, Rhone visited Industrial Medicine Associates P.C. and saw psychiatrist Christopher Flach, Ph.D., for an Adult Psychiatric Evaluation. (R. 183.) Rhone reported difficulty sleeping, depression, anxiety and panic attacks. (*Id.*) After the examination, Dr. Flach found that Rhone's thought processes were coherent, and that he could understand simple directions and perform simple tasks independently. (R. 184-85.) Additionally, Rhone was able to maintain concentration, maintain a regular schedule, was able to socialize with and relate to others, and could function on a daily basis with chores and transportation. (*Id.*) Dr. Flach did, however, diagnose Rhone with a depressive disorder, and reported that he may have difficulties dealing with stress. (*Id.*)

### E. V. Reddy – Psychiatric Review /Mental Residual Functional Capacity Assessment

Rhone visited psychologist V. Reddy ("Reddy") for a psychiatric review and mental residual functional capacity assessment on February 7, 2011. (R. 154.) Rhone indicated that he was feeling depressed, was avoiding social situations, and was suffering from panic attacks. (*Id.*)

After the examination, Reddy diagnosed Rhone with depressive disorder, generalized anxiety disorder, and alcohol and cannabis abuse. (R. 157, 159, 162.) He reported that Rhone would have mild restrictions in daily living activities and mild difficulties in maintaining social functioning. (R. 164.) He also reported that Rhone would have moderate difficulties in maintaining concentration, persistence and pace. (*Id.*) Reddy concluded that Rhone's affective disorder would not cause more than a minimal limitation on his ability to do work or function outside of his home. (R. 165.)

Further, as part of the mental residual functional capacity assessment, Reddy found that Rhone was moderately limited in his ability to understand, remember and carry out detailed instruction, to maintain attention and concentration for extended periods, to work in coordination and proximity to others without being distracted by them, and to perform activities with a schedule, maintain regular attendance and be punctual. (R. 168.) Reddy noted that Rhone would be moderately limited in his ability to complete a full work day "without an unreasonable amount and length of rest periods." (R. 169.) Rhone would also be moderately limited in his ability to interact with the general public, respond to criticism from supervisors, get along with co-workers, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanness, respond to changes in a work setting and make plans independently of others. (*Id.*) Reddy's ultimate conclusion was that Rhone was functioning independently and branching out more socially, and was "able to perform entry level tasks in a low personal contact setting" as supported by Rhone's medical record. (R. 170.)

8

## F. Dr. J. Koncak — Physical Residual Functional Capacity Assessment

Rhone visited Dr. J. Koncak on February 9, 2011 for a physical residual functional capacity assessment. (R. 172.) Rhone indicated to Dr. Koncak that he had difficulty walking due to pain in his left ankle. (R. 173.) Dr. Koncak found that Rhone could occasionally lift and carry up to ten pounds, stand or walk for at least two hours in an eight-hour workday, and could sit for a total of around six hours in an eight-hour workday. (R. 173-74.) Dr. Koncak also found that Rhone had Achilles tendonitis, left ankle tenderness, low back pain and general trouble walking as a result of ankle pain. (*Id.*) Dr. Koncak concluded that Rhone had a residual functional capacity for sedentary work. (R. 174.)

## G. FEGS - Biopsychosocial Summaries

Rhone was evaluated by the Federation Employment & Guidance Service ("FEGS") in February 2011 and June 2013. (R. 304, 655.) In 2011, a FEGS physician confirmed that Rhone was suffering from depression and general anxiety disorders (R. 323, 341) and ultimately concluded that Rhone "had substantial limitations to employment," based on the medical conditions reported which would last at least 12 months and "make [him] unable to work." (R. 322.) Two years later, in June 2013, FEGS produced another Biopsychosocial Summary on Rhone. (R. 655.) As for his physical impairments, Rhone indicated that he continued having difficulty walking or standing for long periods, and was still suffering from pain in his Achilles tendon, tendonitis in his left foot, pain in his left shoulder, back pain, depression, an anxiety disorder, and posttraumatic stress disorder. (R. 666.) A FEGS physician found that Rhone's Achilles tendon was not torn, but that the rest of his statements were accurate. (R. 672.) No work limitations were reported. (*Id.*) However, regarding his mental condition, the FEGS psychiatrist determined that Rhone appeared

9

to have chronic mental illness including affective disorder, anxiety disorder and personality disorder that prevents adherence to a regular work routine and, therefore, prevents employment. (R. 676, 682-83.) The report again concluded that Rhone had "substantial functional limitations to employment due to medical conditions that will last at least 12 months." (R. 676, 683.)

## DISCUSSION

### I.   Legal Standards

#### A.   Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). "[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise."

10

*Brault v. Soc. Sec'y Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and emphasis omitted); *see also Florencio v. Apfel*, No. 98 Civ. 7248 (DC), 1999 WL 1129067, at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (internal quotations & alterations omitted)). The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" *See Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012)

### B. Determination Of Disability

Under the Social Security Act (the "Act"), every individual determined to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

11

In determining whether an individual is disabled for disability benefit purposes, the

Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions

based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience." *Mongeur v.*

*Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating

disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509 [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520.

12

### C. The ALJ's Duty To Develop The Record

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a 12-month period. 42 U.S.C. § 423(d)(5)(b), 20 C.F.R. § 404.1512(d). Because social security proceedings are "essentially non-adversarial," the ALJ has an affirmative duty to develop the record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) (internal citation omitted). This duty is heightened for a *pro se* claimant, *see Morris v. Berryhill*, No. 16-CV-2672, 2018 WL 459678, at \*2 (2d Cir. Jan. 18, 2018) (summary order), as well as when the disability in question is a psychiatric impairment. *See Estrada v. Comm'r of Soc. Sec.*, No. 13-CV-04278 (CM) (SN), 2014 WL 3819080, at \*3 (S.D.N.Y. June 25, 2014).

The ALJ's duty to develop the record "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Emanuel v. Berryhill*, No. 16-CV-5873 (JLC), 2017 WL 5990128, at \*8 (S.D.N.Y. Dec. 4, 2017) (citations omitted). However, "where there are no obvious gaps in the record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 72 n.5 (2d Cir. 1999) (internal citation omitted).

### II. ALJ Friedman's Decision

Following the five-step sequence, ALJ Friedman determined that Rhone did not have a disability within the meaning of the Act. At step one of the sequential evaluation process, the ALJ found that Rhone had not engaged in substantial gainful activity since the February 21, 2009 application date. (R. 548.) Next, the ALJ carefully reviewed the record evidence and found at step

13

two that Rhone had medically determinable impairments of lumbago,[4] left ankle pain secondary to Achilles' tendinitis, depression, anxiety, and a history of drug and alcohol abuse. (*Id.*) At step three, the ALJ determined that Rhone did not have any one impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.*) Next, the ALJ found that Rhone had the residual functional capacity to perform light work, except as restricted to jobs with a sit/stand option involving only occasional contact with supervisors coworkers or the general public. (R. 55-554.) At step four, the ALJ found at step four that Rhone was incapable of performing past relevant work. (R. 554.) The ALJ's determination was based, in part, on his finding that Rhone's past work involved more direct contact with people on a regular basis than was recommended by Rhone's physicians. (*Id.*) At step five, the ALJ found that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 555.) In making that determination, the ALJ relied on testimony by a vocational expert that Rhone would have been able to perform the requirements of several light-exertional level jobs numbering in total up to 400,000 positions nationally. (R. 555, 575-76.) Finally, the ALJ noted that the Medical-Vocational Rules supports the finding that Rhone can be found "not disabled" whether or not his particular job skills were transferrable. (*Id.*) As such, the ALJ found that Rhone was not disabled and denied his claims for benefits. (R. 556.)

---

[4] "Lumbago" is defined as "[p]ain in id and lower back; a descriptive term not specifying cause." *Stedman's Medical Dictionary* 1121 (28th ed. 2005).

14

### III. Analysis

Rhone contends that the decision of the ALJ should be reversed because it was "not based upon a full and fair evaluation of the entire record, not supported by substantial evidence and reached through material error." (Pl.'s Mem. of Law ("Pl.'s Mem."), ECF No. 15, at 4-5.) In support of his position, Rhone's counsel makes various arguments, including many related to the ALJ's alleged failure to fully develop the record. (Pl.'s Mem. at 4-9.) The Court will address these arguments as best it can discern them.[5]

### A. The ALJ Adequately Developed The Record

Rhone argues that the record did not contain functional assessments or medical source statements from all of his treating sources and that ALJ Friedman did not take any steps to obtain all his records. (Pl.'s Mem. at 8). However, Rhone does not identify the treating sources he contends were not considered. Nor does he identify any additional records that he believes should have been obtained and reviewed by the ALJ. Rhone also contends that ALJ Friedman should have re-contacted the sources from whom he received "his medical and psychological treatment" in order to make a reliable assessment of his functional capacity, "particularly in light of his psychotherapist's refusal to provide additional opinions of each impairment restricted." (Pl.'s Mem. at 6-7.) However, "[t]he duty to recontact arises only if the ALJ lacks sufficient evidence in the record to evaluate the doctor's findings." Morris, 2018 WL 459678, at *2; see also

---

[5] The Court notes that the memorandum of law submitted by Plaintiff's counsel, Herbert S. Forsmith, consists primarily of a series of case citations with little effort taken to connect them to the facts at issue in this case. This appears to be consistent with memorandum filed by Mr. Forsmith in other cases. See, e.g., Grosse v. Comm'r of Soc. Sec., No. 08-CV-4137 (NGG), 2011 WL 128565, at *2 (E.D.N.Y. Jan. 14, 2011) (describing "rudderless, stream-of-consciousness" memorandum submitted by Mr. Forsmith and noting his routine filing of "similarly incomprehensible" documents).

15

20 C.F.R. § 404.1520b (giving ALJs flexibility in determining whether and how to address insufficiencies in the record). Here, the record contained 435 pages of medical records, including Rhone's medical records from the Ryan Center where he was treated by Levin, and there is no indication that these records were insufficient to allow the ALJ to evaluate Levin's findings. *See id.* (potentially missing records, with no indication that they contained significant information, did not render record evidence inadequate).

Rhone also argues that ALJ Friedman did not fully question him, including with regard to his "emotional reaction to his impairments" and his "psychological symptoms[.]" (Pl.'s Mem. at 7-8.) However, the record included testimony by Rhone that because his injuries prevented him from being part of the theater community, "that is where the depression happens." (R. 567.) The ALJ also asked Rhone if there was anything he would like to say about his situation that had not been talked about. (R. 572.) After first saying no, Rhone testified further regarding his emotional state. (R. 572-73.) The Court finds that this testimony, in conjunction with Rhone's medical records, gave the ALJ a sufficient basis to assess Rhone's functional capacity. Further, additional testimony is not likely to have helped Rhone because the ALJ found that he was not entirely credible. (R. 551.)

In light of the robust medical record before the ALJ, and Rhone's failure to identify with specificity any way in which that record was lacking, the Court finds that the record was sufficient and ALJ Friedman did not fail to adequately develop the record.

## B. The ALJ's Finding That Rhone Had A Residual Functional Capacity For Light Work Was Supported By Substantial Evidence

The ALJ stated in his decision that Rhone "had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that he is restricted to jobs with a sit/stand

16

option that involve simple, routine, repetitive type tasks with only occasional contact with supervisors, coworkers and the general public." (R. 550.) The ALJ's finding is supported by substantial evidence from the record.

### 1. Rhone's Physical Residual Functional Capacity

The ALJ's determination that Rhone's physical residual functional capacity was for light work was supported by substantial evidence. Dr. Sheila Minaya of the Ryan Center, Rhone's treating physician, reported by late 2010 that despite his diagnosis of Achilles tendinitis, Rhone had a full range of motion in all extremities, and reported living a generally healthy and active lifestyle. (R. 204, 206.) This diagnosis was supported by the assessment done by Dr. Mathew, a medical consultant. After a physical examination, Dr. Mathew found full ranges of motion in most extremities, the exception being limited flexion in Rhone's left ankle, as well as limited range of motion in his thoracic and lumbar spines. (R. 180.) As a result, Dr. Mathew found that Rhone was moderately limited in heavy lifting and carrying, bending, prolonged walking, squatting, and climbing, as well as mildly to moderately limited in prolonged sitting and standing. (R. 181.)

Dr. Konack, in conducting a physical functional capacity assessment, found similar limitations in Rhone's ankle and back, but determined that Rhone had a residual functioning capacity for sedentary work as opposed to light work. (R. 174.) Rhone's last physical assessment at FEGS noted the development of Rhone's rheumatoid arthritis, but still found no major physical restrictions. (R. 666, 672.)

The ALJ ultimately gave "great weight" to Dr. Mathew's opinion because it was based on her examination findings. The ALJ took this into account, along with Rhone's testimony that he

17

could not stand for long periods of time, in limiting Rhone to light work with a sit/stand option. (R. 552). Even though Dr. Konack determined that Rhone had capacity only for sedentary work, he was not a treating physician and therefore his opinion is entitled to no more weight than Rhone's other providers.

## 2. Rhone's Mental Residual Functional Capacity

The ALJ's finding as to Rhone's mental capacity to work was also supported by substantial evidence in the record. Rhone's psychotherapist, LCSW Andrea Levin, and Dr. Merkin treated Rhone at the JBFCS with weekly visits between March 2008 and June 2012. (R. 219-303, 391-535.) While the diagnoses of depression and anxiety remained, along with other symptoms of instability, Rhone had been making strides throughout his treatment in limiting his substance abuse and engaging in social settings more frequently. (R. 272-89.) Dr. Flach's report from December 2010 ultimately found that Rhone did not suffer from significant mental limitations aside from minor stresses. However, the ALJ determined that Rhone was more limited than Dr. Flach found him to be and gave more credit to the opinion of psychologist Reddy that Rhone could perform entry-level tasks in a low personal contact setting. (R. 553.) The ALJ explained that he gave Reddy's testimony "great weight" as it was consistent with Dr. Flach's findings and with Rhone's medical records. (R. 553.)

Rhone's medical records do indicate that he continued to suffer from social anxiety in 2011 and 2012, but the ALJ's determination that Rhone was restricted to jobs with only occasional contact with supervisors, coworkers and the general public, accounts for this condition. And despite the fact that Rhone's two Biopsychosocial summaries by the FEGS indicated that Rhone "would not be able to function in a work environment," there seems to be

18

an improvement in Rhone's condition between his 2011 and 2013 summaries, and the latter report noted that Rhone's mental status was mostly within normal limits. The ALJ does not credit the FEGS psychiatrist's opinion that Rhone would be permanently disabled from work (R. 554), as he correctly explains that that is a determination reserved for the Commissioner. *See, e.g., Guzman v. Astrue*, No. 09–CV–3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (a treating physician's statement that a claimant is disabled or unable to work is not controlling because it is a legal conclusion reserved for the Commissioner). However, the ALJ did take into account the opinion of the FEGS physician that Rhone had reduced concentration and memory, and of the FEGS psychiatrist that Rhone needed a low stress environment, by limiting Rhone to simple, routine, repetitive type tasks. (R. 553-54.)

As for the psychiatric/psychological impairment questionnaire completed by Levin in June 2012 (R. 383-90), the ALJ notes that she is a social worker, not a doctor, and thus the treating physician rule, which would have required him give controlling weight to her opinion, does not apply. (R. 554.) *See Rodriguez v. Astrue*, No. 11 CIV. 7720 (CM) (MHD), 2012 WL 4477244, at *36 (S.D.N.Y. Sept. 28, 2012) (quotations omitted). Nevertheless, the ALJ further noted that Levin refused to comment on Rhone's capacity in the workplace and did not record any specific limitations in areas of mental functioning. (R. 554.) The ALJ also highlighted the fact that Levin reported that Rhone's GAF score at the time was 52, which indicates moderate symptoms. (*Id.*)

In light of the entire record, the ALJ's finding regarding Rhone's residual functional capacity was supported by substantial evidence. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (ALJ "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.") (citing *Perales*, 402 U.S. at 399).

19

C.  **The ALJ's Finding That There Were Jobs That Existed In Significant Numbers In The National Economy That Rhone Could Perform Was Supported By Substantial Evidence**

The ALJ recognized that Rhone was 52 years old (R. 554), had at least a high school education and was able to communicate in English. He then found that a lack of transferability of job skill was irrelevant given the use of Medical-Vocational Rules as a framework to support a finding that the claimant is not disabled. *See* SSR 82-41, 20 C.F.R. Part 404, Subpart P, Appendix 2. These factual findings, together with a residual functional capacity for light work, correspond to Medical-Vocational Rule 201.18, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.18.3. Under that rule, Rhone would be found not disabled. 20 C.F.R. § 416.969; *Heckler v. Campbell*, 461 U.S. 458, 461 (1983). The ALJ concluded that Rhone's additional limitations impeded his ability to perform all or substantially all of the requirements for light work, and therefore relied upon the vocational expert to determine whether someone matching Rhone's age, education, work experience, and residual functional capacity could perform a job that existed in significant numbers in the national economy. (R. 555, 574.)

The ALJ asked the expert to "assume a light physical  RFC [residual functional capacity], restricted to jobs with a sit-stand option[,]" and "further restricted to jobs involving simple, routine, repetitive type tasks and requiring only occasional contact with supervisors, co-workers, and the public." (R. 574.) The vocational expert testified that, based on his knowledge and expertise from conducting and supervising labor market surveys, he was able to account for three different job titles amounting to a total of approximately 400,000 positions nationwide that met the criteria set out by the ALJ. (R. 574-77.) The three examples of jobs he provided were bench assembler, assembler of electrical accessories, and inspector. (R. 574-76.) The expert testified

20

that his findings were, in part, based on his personal knowledge and experience regarding the number of sick days and time spent off-task that is consistent with competitive employment. (R. 555, 576-77.) This testimony provides substantial evidence to support the ALJ's step-five finding. *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (ALJ reasonably credited vocation expert's testimony that was based on the expert's professional experience and clinical judgment, and which was not undermined by any evidence in the record).

## CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiff's motion for judgment on the pleadings be DENIED and the Commissioner's cross-motion for judgment on the pleadings be GRANTED.

DATED:    February 8, 2018
          New York, New York

Stewart d. aaron

**STEWART D. AARON**
**United States Magistrate Judge**

\*          \*          \*

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies

21

delivered to the chambers of the Honorable Colleen McMahon at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing

objections must be addressed to Judge McMahon. The failure to file these timely objections will

result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

22